John SAS
v.
STATE OF MARYLAND, Director of Patuxent Institution.

Timothy Patrick O'CONNOR
v.
STATE OF MARYLAND, Director, Patuxent Institution.

George L. CRESWELL
v.
DIRECTOR, PATUXENT INSTITUTION.

James C. SHINE
v.
STATE OF MARYLAND, Director of Patuxent Institution and the Maryland State Legislature.

Albert Delanor MUREL
v.
BALTIMORE CITY CRIMINAL COURT
and
Director of Patuxent Institution, State of Maryland.

Robert N. HAYES, Jr.
v.
Harold M. BOSLOW, M.D., Director, Patuxent Institution.

Gene David WEDDLE
v.
DIRECTOR, PATUXENT INSTITUTION
and State of Maryland.

Charles C. COFIELD
v.
STATE OF MARYLAND, Patuxent Institution.

Charles Mason TIPPETT
v.
STATE OF MARYLAND, and Director of Patuxent Institution.

Charles M. CRAIG, Jr.
v.
STATE OF MARYLAND, Director of Patuxent Institution.

William R. MONROE
v.
DIRECTOR OF the PATUXENT INSTITUTION, and State of Maryland.

John E. SIMON
v.
STATE OF MARYLAND.

Civ. A. Nos. 14808, 14451, 14891, 14792, 14197, 13919, 14787, 15031, 15349, 15189, 12556 and 15318.

United States District Court
D. Maryland.

Jan. 15, 1969.

Patrick J. B. Donnelly, Baltimore, Md., Karl G. Feissner, Feissner, Kaplan, Miller & Smith, Hyattsville, Md., Alan H. Murrell, Harry E. Silverwood, Jr., Baltimore, Md., for petitioners.

Francis B. Burch, Atty. Gen., Alfred J. O'Ferrall, Franklin Goldstein and Morton Sacks, Asst. Attys. Gen., Baltimore, Md., for the State of Maryland.

WATKINS, District Judge.

In Sas v. Maryland, 4 Cir. 1964, 334 F.2d 506, a panel of the United States Court of Appeals for the Fourth Circuit—although holding that the Maryland Defective Delinquents Act, Annotated Code of Maryland, Article 31B (Supp.1961) [hereinafter the Act] was "facially constitutional" (334 F.2d at 509); that the Court "cannot agree [with petitioners' contention] that the statutory definition" of a defective delinquent "upon its face is unconstitutional" (334 F.2d at 513); and that examination of "the trial and hearing provisions of the Act can leave no doubt that it places around the accused more procedural safeguards than any of the Acts of a similar nature which have been upheld by the courts [including the Supreme Court] against * * *" an attack based upon denial of procedural due process (334 F.2d at 515)—remanded the consolidated petitions for habeas corpus relief by five inmates committed to Patuxent Institution under the Act for liberal reconsideration of the challenges made as to the constitutionality of the Act, such reconsideration involving "a critical analysis on the broadest of terms after a careful factual development of its present operation. Townsend v. Sain, 372 U.S. 293, 83 S. Ct. 745, [9 L.Ed.2d 770] (1963)." (334 F.2d 517).

The trial court was specifically directed to "determine whether the statute is being constitutionally applied" (334 F.2d at 509) and in so doing to consider and determine, in addition to any points which counsel might raise;

I. "[W]hether the statutory definition of a defective delinquent as applied by the Maryland courts is sufficiently definitive to permit its practical application within constitutional limitations;"

II. "[W]hether the procedures embodied in the statute are applied in such a manner as to afford due process to the accused within the confrontation requirements of the sixth amendment;"

III. "[W]hether the proposed [sic] objectives of the Act are sufficiently implemented in its actual administration to support its categorization as a civil procedure and justify the elimination of conventional criminal procedural safeguards, Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963);"

IV. "[W]hether the interpretation and application of the statutory requirement that a defective delinquent be found to be 'an actual danger to society' may within the eighth amendment's prohibition against cruel and unusual punishment include those whose conduct indicates no more than a danger to prop-

erty rights as distinguished from violence to the person;"

V. "[W]hether Patuxent does in fact furnish treatment for treatable defective delinquents as distinguished from other lawbreakers which would support the Act under the equal protection clause of the fourteenth amendment." (334 F.2d at 509).

Perhaps implicit in the foregoing are the following questions raised, at the conclusion of the opinion:

VI. Whether the statute, though "fair on its face and impartial in appearance" is being "administered in the spirit in which it is conceived" and has not "become a mere device for warehousing the obnoxious and antisocial elements of society." (334 F.2d at 516).

VII. Whether "[D]eficiencies in staff, facilities, and finances" have undermined "the efficacy of the Institution and the justification for the law, and * * * the constitutionality of its application." (334 F.2d at 517).

Later, seven other habeas corpus cases by inmates of Patuxent Institution (the place of confinement designated in the Act and hereinafter "Patuxent") who had appealed to the United States Court of Appeals for the Fourth Circuit, were remanded by it and were by this court [1] consolidated with the original Sas cases. Other habeas corpus cases also raising questions as to the constitutionality of the Act, and its administration, were stayed by this court, pending its decision in the consolidated Sas cases.

Counsel were appointed for the twelve petitioners, and conferences were held between them and this court, and representatives of the office of the Attorney General of Maryland. It was unanimously decided that prosecution of the Consolidated Sas cases in this court

should be deferred [2] in view of the remand by the Maryland Court of Appeals of Daniels v. Director, 1965, 238 Md. 80, 206 A.2d 726. In that case the Maryland Court of Appeals had said (238 Md. at 83–84, 206 A.2d at 728–729):

"Lastly, the applicant, claiming that the application of § 5 of Art. 31B to his intellectual and emotional status, has put him in double jeopardy and made him a victim of cruel and unusual punishment in that he is compelled to endure a life sentence for a petty property offense for which, in the first instance, he was given a sentence of not more than three years, contends, that the lower court, by not affording him a plenary hearing for the purpose of inquiring whether Patuxent is fulfilling its purpose as to him, thereby denied him the right to show that he is in fact confined in a penal institution undergoing punishment rather than treatment for his alleged defective delinquency in violation of his constitutional rights. While the record before us does not indicate whether the question posed here was ever raised below, or whether a proffer was ever made as to what the applicant intended to show with respect thereto, such question, although inartfully stated, was raised in the motion for a judgment n. o. v., or in the alternative, for a new trial, and we think the lower court should have considered it.

"The application for leave to appeal will be denied as to all contentions except the last one. As to it, leave to appeal will be granted and the case remanded so that the lower court may determine whether his continued detention at Patuxent is a violation of his constitutional rights, Sas v. Maryland, 334 F.2d 506 (4th Cir. 1964).

1. The Sas cases were originally assigned to Judge Harrison L. Winter and the writer of this opinion. Upon Judge Winter's appointment to the United States Court of Appeals for the Fourth Circuit, the entire responsibility has devolved upon the writer, who is solely responsible for this opinion.

2. The order entered following these conferences expressly gave leave to re-apply to this court for a hearing, if the Daniels case was not promptly heard. No such application was made.

On remand, the hearing judge, besides making provision for an adequate record of the proceedings, shall make explicit findings of fact and expressly state his conclusions of law."

In Murel v. Director, 1965, 240 Md. 258, 213 A.2d 576, the Maryland Court of Appeals elaborated on the scope of the hearing to be had in the Daniels remand. Murel had raised various constitutional questions as to Patuxent, and "a specific issue as to whether he, as one of the inmates of Patuxent, was receiving effectual treatment for his defective delinquency." (240 Md. at 260, 213 A.2d at 577). As to this point the court remanded the case "to await the *final* outcome of the Daniels case now pending in the Circuit Court for Prince George's County." (240 Md. at 261, 213 A.2d at 578; emphasis in original).

As to the scope of the review in Daniels, the court further said (240 Md. at 260, 213 A.2d at 577):·

"The *Daniels* case, having been remanded to the Circuit Court for Prince George's County, is still pending in that court. We are informed by the Attorney General, however, that both parties, and the circuit court, are in agreement that the mandate of this Court in the Daniels case is such as to render the scope of the facts and other matters to be considered therein on the remand as broad as those constitutional issues outlined by the United States Court of Appeals in Sas v. Maryland, supra."

The Circuit Court for Prince George's County (Digges, C. J. and Powers, J.) carefully followed the instructions contained in the remands in Daniels v. Director, 1965, 238 Md. 38, 83–84, 206 A.2d 726 and Murel v. Director, 1965, 240 Md. 258, 260, 213 A.2d 576. Eight days were devoted to the hearing [3] of oral testimony, from medical and lay experts, the testimony covering more than eight hundred printed pages, with sixty-four *exhibits*. That court [4] filed an extensive opinion, finding the Act valid on its face, and in its interpretation and application.[5] Filed together with the opinion were separate Findings of Fact.

On appeal the Maryland Court of Appeals, having "read the record with meticulous care and considered it at length with full deliberation" was "convinced that the conclusions reached by the trial court rest on a foundation of sound law properly applied to proven justifying facts" and adopted "the careful and thorough opinion of Judges Digges and Powers and its Appendix A 'Court's Findings of Fact' and Appendix B 'Trial Summary' * * * as the ex-

3. The judges participated actively, but entirely properly, in the examination of witnesses.

4. For convenience, the Circuit Court for Prince George's County will hereinafter be referred to as the "Circuit Court"; the United States Court of Appeals for the Fourth Circuit as the "Fourth Circuit"; the Maryland Court of Appeals by its full title; and the United States District Court for the District of Maryland as "this Court."

5. For reasons set forth in the opinion of the Circuit Court, and summarized in the opinion of the Maryland Court of Appeals, Director v. Daniels, 1966, 243 Md. 16, 22–24, 221 A.2d 397, cert. den. 1966, Avey v. Boslow, 385 U.S. 940, 87 S.Ct. 307, 17 L.Ed.2d 219, shortly before the Circuit Court opinion was to be filed, it was realized that there was a strong probability that Daniels had been convicted on his plea of guilty of a crime which would not serve as a basis of referral to and confinement in Patuxent. Thereupon a bill for declaratory judgment on behalf of Bradley Arlington Avey, then concededly properly in Patuxent for diagnosis as a possible defective delinquent, was filed, alleging that he was being held in violation of his constitutional rights, and assigning all the grounds urged on behalf of Daniels. This bill was answered by the State, and the Avey and Daniels cases were consolidated, upon a stipulation that the Daniels record (except for the portions applicable only to Daniels), was to be considered as if made in the Avey case.

Daniels was ordered released because improperly committed to Patuxent, but the Circuit Court and the Maryland Court of Appeals held as to Avey that the Act was constitutional and was being constitutionally applied.

pression of the reasons we agree with the conclusions of the trial court, and are to be printed as part [6] of the opinion herein of this Court * * *." Director v. Daniels, 1966, 243 Md. 16, 28, 221 A.2d 397, 404, cert. den. 1966, Avey v. Boslow, 385 U.S. 940, 87 S.Ct. 307.

After the decision of the Maryland Court of Appeals in Director v. Daniels, 1966, 243 Md. 16, 221 A.2d 397 supra, further joint conferences were held with counsel for the petitioners, and with representatives of the office of the Attorney General of Maryland. The State took the position that under the principle of Townsend v. Sain, 1963, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770, this Court should simply review the decisions of the Circuit Court and the Maryland Court of Appeals, and the record upon which they were based, and decide therefrom whether the decisions were supported by the record, and consistent with law. Counsel for the petitioners objected to so limiting this Court's inquiry and review. This Court ruled that the record before the Circuit Court and the Maryland Court of Appeals should constitute part of the record before this Court, but that it could be supplemented by either side. Counsel for petitioners thereupon filed a series of interroga-

tories which on objection were somewhat limited, but still a matter of months was required to develop the material requested.

A hearing was then had, which with argument lasted four full days. This Court has reviewed the entire record [7] and briefs (including those filed by inmates of Patuxent) and finds that the facts found by the Circuit Court, and the opinions expressed by the Circuit Court and the Maryland Court of Appeals, are fully justified by the record before them, and are consistent with and supported by the additional record made before this Court.

Much as this court would like to rest upon the preceding paragraph, it feels that some further discussion is required to meet the mandate of the Fourth Circuit, particularly in view of decisions handed down since the opinion of the Circuit Court or not considered of record by it. So far as possible, this Court's discussion will, however, be limited to an amplifiction or emendation of the opinions set forth in Directory v. Daniels, 1966, 243 Md. 16, 221 A.2d 397, supra.

I. Whether the statutory definition of a defective delinquent as applied by the Maryland courts is suffi-

6. The opinion of the Maryland Court of Appeals, with that of the Circuit Court, is found in 243 Md., pages 21–74, 221 A. 2d 397, 404. Of these, the Maryland Court of Appeals opinion covers pages 21–28. Pages 21–24 deal with its remands in Daniels and Murel, supra, and the consolidation of the Daniels and Avey cases, supra; pages 24–25 deal with some of the points raised by the Fourth Circuit; and pages 26–28 with a consideration of the proceedings in and the decision of the Circuit Court. Pages 28–50 carry the opinion of the Circuit Court; Appendix A ("Court's Findings of Fact") appears at pages 50–65; and Appendix B ("Trial Summary") at pages 66–74.

7. Except it has considered only those answers to Interrogatories it has been specifically asked to consider:
   " * * * By examining the records of the actual trials of the petitioners, the district court can determine wheth-

er in application these safeguards result in basic fairness of procedure imposed upon the state by the fourteenth amendment." (334 F.2d 506, 516).
Counsel for petitioners requested this Court to read the transcript only as to the last redetermination hearing of Charles M. Tippett, and particularly the arguments and the Court's instructions. While the arguments leave much to be desired, the instructions of the trial court adequately instructed the jury as to the law. This court does not feel that the Tippett case reached the point of constitutional infirmity. And see Tippett v. Director, 1967, 2 Md.App. 465, 235 A. 2d 314.
   All counsel for petitioners agreed that in the cases of the remanding petitioners, both the original and the redetermination proceedings "meet with the constitutional safeguards of due process * * *" (Transcript, pages 664–665).

ciently definitive to permit its practical application within constitutional limitations.

This problem and its origin are expressed by the Fourth Circuit as follows (334 F.2d 513–514):

"The petitioners attack the Act on several constitutional grounds. First it is contended that the definition of the defective delinquent as set forth in the statute is too vague both as to the class of persons who fall within the Act and the applicable tests to ascertain guilt to constitute valid legislation.

"We cannot agree that the statutory definition upon its face is unconstitutional. The subject matter of the statute—the health, welfare and safety of the people of Maryland—is within the area of the police power of the legislature. This being true, only if the Act has not real or substantial relation to that objective—or is palpably and patently an invasion of the individual's constitutional rights—may the courts strike down the Act. Jacobson v. Massachusetts, 197 U.S. 11, 31, 25 S.Ct. 358, 49 L.Ed. 643 (1905). In Minnesota ex rel. Pearson v. Probate Court, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940), the appellant had filed a writ of prohibition to prevent the probate judge from trying him as a 'Psychopathic Personality' under the Minnesota Act. The Minnesota Appellate Court had defined the Act to apply to persons who by an habitual course of misconduct showed an utter lack of power to control their sexual impulses and hence were likely to attack others or otherwise inflict injury. In upholding the statute, as construed by the state court, Chief Justice Hughes held that there was a rational basis for the class selected by the legislature; that the definition was not so vague or indefinite as to constitute invalid legislation and, therefore, the Act was constitutional upon its face. While psychiatrists no longer approve the term psychopath as a definitive medical term, we note that the definition adopted by the Minnesota Appellate Court and approved by the Supreme Court was not dependent upon the medical acceptability of the term psychopath. It is obvious that the Maryland statutory definition was carefully drawn to conform to the definition approved by the Court in the Minnesota case.

"The Maryland Court of Appeals, however, has construed the statutory definition to include mentally deficient persons and/or psychopaths who by persistent aggravated anti-social or criminal behavior have clearly demonstrated themselves to be such an actual danger to society as to require confinement. Palmer v. State, 215 Md. 142, 137 A.2d 119, 122 (1957). Whether or not the court's interpretation of the words 'emotionally unbalanced' as used in the statutory definition to include 'psychopath'—a term which is not determinable by medical standards alone—has rendered the definition too vague to be constitutionally acceptable is a matter which may not be determined without the aid of expert testimony not available on this record. Counsel for the petitioners offer the expert writings of members of the Patuxent staff to show that 'emotional unbalance' is such a quantitatively and qualitatively inaccurate term that any person who seeks to apply the definition is forced to depend upon an individual interpretation of the evidence of past antisocial and criminal conduct. Again it is the district court which must provide a record which will offer a solution to this issue."

This Court feels that the Fourth Circuit's concern (which was not and is not shared by the writer) is fully overcome in the Daniels opinion.

That the Maryland Court of Appeals did not intend to equate "emotional unbalance" with "psychopath" would seem clear from:

(a) The Fourth Circuit's own statement (334 F.2d at 514) that:

"It is obvious that the Maryland statutory definition was carefully drawn to

conform to the definition approved by the" Supreme Court in Minnesota ex rel. Pearson v. Probate Court, 1940, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744. In that case appellant sought prohibition against proceeding against him as a "psychopathic personality" under a Minnesota statute expressly using and defining the term. The Supreme Court accepted the construction of the statute by the Minnesota Supreme Court, in which the latter court said:

> " 'Applying these principles to the case before us, it can reasonably be said that the language of Section 1 of the act is intended to include those persons who, by an habitual course of misconduct in sexual matters, have evidenced an utter lack of power to control their sexual impulses and who, as a result are likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of their uncontrolled and uncontrollable desire. It would not be reasonable to apply the provisions of the statute to every person guilty of sexual misconduct nor even to persons having strong sexual propensities. Such a definition would not only make the act impracticable of enforcement and, perhaps, unconstitutional in its application, but would also be an unwarranted departure from the accepted meaning of the words defined.' " 309 U.S. 270, at 273, 60 S.Ct. 523, at 525.

The Supreme Court of the United States upheld the denial of the writ, and accordingly recognized that it would not be unconstitutional to find the appellant to be a "psychopathic personality." What was meant by the term was adequately described, and the United States Supreme Court was concerned with the content, not the label. In Palmer v. State, supra, the Maryland Court of Appeals made it clear (215 Md. at 147, 137 A.2d at 122) that it understood that emotional unbalance "was to refer to those people known medically as psychopaths or as psychopathic personalities. These persons *were described* in Guttmacher and Weihofen, Psychiatry and the Law (1952)" [emphasis supplied] and the court quotes the description. Here again it is the content—the characteristics of the people described, not the convenient, if improper, label—which is controlling. What the Maryland Court was doing was to say that emotional unbalance as used in the Act referred and was to be applied to people with certain described characteristics, who at that time were referred to by Guttmacher, et al. as psychopaths—a term no longer in accepted use.[8]

(b) The Maryland Court of Appeals in Director v. Daniels, supra, § 243 Md. 24, 221 A.2d 402 stated that the Fourth Circuit "almost inexplicably, read the decision in Palmer v. State, 215 Md. 142, 137 A.2d 119, to hold that this Court had implanted the word 'psychopath' into the statutory definition as always synonymous with the term 'emotionally unbalanced' * * *"[9]

---

8. See also opinion of Circuit Court, 243 Md. 33–37, 55–56, 221 A.2d 397.

9. The Maryland Court of Appeals (243 Md. 26, 221 A.2d 403) in purportedly paraphrasing the Sas opinion, refers to "the view that there is a determinable category of legally sane (but for practical purposes insane) persons who because of intellectual or emotional defects have demonstrated a propensity toward criminal behavior which they cannot control * * *."

The parenthetical language is unfortunate:

(1) It is not found in the language paraphrased (see 334 F.2d 516).

(2) The words "for practical purposes insane" are ambiguous. This Court believes that the Maryland Court of Appeals, by the above quoted parenthetical language, in the context in which it was used, meant only that the Fourth Circuit was saying that the Act recognized the distinction between the so-called "normal" criminal, and the category of legally sane persons who by reason of mental or emotional deficiencies evidence a propensity toward criminal activity, which they are incapable of controlling. They are thus, "for practical purposes" to be considered as falling within a special category, requiring special consideration and treatment.

(c) The Circuit Court (243 Md. 35–37, 55–56, 221 A.2d 397) dealt in detail with the language used in the Palmer case. It then states:

"* * * We conclude that in the light of the testimony in this case there is no need to give any further medical description to the nonmedical term 'emotional unbalance' and that *if the matter is ever squarely before the Court of Appeals* that Court will conclude that the term 'psychopath' is not a synonym for emotional unbalance, but that the term 'emotional unbalance' as used in the Act refers to a medically recognized psychiatrically disordered person, who demonstrates 'persistent aggravated anti-social or criminal behavior', and who exhibits a type of psychiatric disorder manifested by deep-seated emotional conflicts which distort the individual's attitude toward society, and of society's attitude toward him, resulting in an uncontrollable desire and need to create continual hostile acts toward society and which is uncontrollable by the individual. It was in this context, we feel, that the doctors were describing a particular type of individual when they used the term 'psychopath' and it is in that context that the Court of Appeals used the term 'psychopath' as defined by Guttmacher and Weihofen. With this description of the term 'psychopath' we feel that the use of the term in the Palmer case does not destroy the validity of the statutory definition so as to cause it to become vague and meaningless * * *" (243 Md. 36–37, 221 A.2d 409; emphasis supplied, see also Findings of Fact, 2b(1) and (2), pages 55–56).[10]

10. That psychiatry is not an exact science, and that terms in addition to "psychopath" and "sociopath" may in the opinion of psychiatrists be susceptible of improvement, was fully developed in the hearings before the Circuit Court. References hereinafter to the transcript before the Circuit Court will be referred to as "E." (short for Exhibit in the record before the Maryland Court of Appeals). References to the transcript of proceedings in this Court will be referred to as "Tr."

One of the psychiatrists (Dr. Meng) testified that all psychiatric diagnosis is subjective (E. 113); that the terms "psychopathic" and "sociopathic" were not very precise, but that in a redetermination hearing he had testified that Daniels was a sociopath (E. 94). He further testified that "intellectual deficiency" was a recognized term, but that he preferred "mentally retarded" (E. 121), and that "emotional unbalance" was "meaningful" but hard to "quantify" (E. 122). He had no trouble with the term "as to clearly demonstrate an actual danger to society." When questioned by the court as to the adequacy of the statutory definition of a defective delinquent, he replied:

"Well, I had not thought about trying to make a definition. I would hate to say I could do better." (E. 124).

As another psychiatrist (Dr. Schnoor) expressed it (E. 145):

"I have yet to find a definition that does not have its exceptions and shortcomings."

A third psychiatrist (Dr. Roche) testified that he and his colleagues had not been able to devise any definition more precise; that it served a purpose; that it would be "workable" with a jury; that the problem of comprehension was similar to that encountered by a jury in understanding and applying the concept of negligence (E. 201–202; and see E. 712).

Dr. Karl A. Menninger considered "imbalance" the same as "unbalance" (E. 273); felt that "intellectual deficiency" was "clear enough" (E. 274) although he preferred "intellectual comprehension" (E. 281); and he liked the language of the statute because "It describes something perhaps not fully—perhaps it is wise that it does not describe it fully—but it pretty clearly identifies the sort of individual in a broad way being referred to." (E. 275).

Dr. Menninger further testified that the language used was a "virtue" of the act; "It is essentially a definition not in scientfic terms but in terms that people use and they can understand it." (E. 325).

Another psychiatrist (Dr. Crowley) agreed with Dr. Menninger that the language of the Act "is better than using psychiatric terms that mean even less." (E. 348). He did not know what terminology of the Act he would eliminate,

In the appeal in the Daniels case "the matter" was "squarely before the Court of Appeals" and the opinion of the Circuit Court, including the language above quoted, and the Circuit Court's Findings of Fact and Trial Summary were "adopted as the expression of the reasons" the Maryland Court of Appeals agreed "with the conclusion of the trial court and are to be printed as part of the opinion" of the Maryland Court of Appeals (243 Md. 28, 221 A.2d 404). The language of the immediately preceding paragraph is therefore the interpretation of the highest court of the State of Maryland, and binding upon this court as to the meaning of the Palmer opinion, and as to the construction that has been given and will be given to the Act by the State of Maryland. This court agrees, and finds, that the Palmer case has not rendered the definition in the Act too vague to be constitutionally acceptable.

This Court is satisfied that it is clear that the Maryland Court of Appeals did not, and does not, intend to equate the two terms, thus removing any question of whether or not the Act is constitutionally vague.

Question No. I is answered in the affirmative.

II. "[W]hether the procedures embodied in the statute are applied in such a manner as to afford due process to the accused within the confrontation requirements of the sixth amendment."

III. "[W]hether the proposed [sic] objectives of the Act are sufficiently implemented in its actual administration to support its categorization as a civil procedure and justify the elimination of conventional criminal procedural safeguards, Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)."

▋ (a) Question II, by reference to confrontation and the Sixth Amendment seems to assume that the procedure in question is criminal in nature, since the Sixth Amendment applies only to criminal prosecutions. Hannah v. Larche, 1960, 363 U.S. 420, 440, 80 S.Ct. 1502, 4 L.Ed.2d 1307. Moreover, the right to confrontation is only one of the many criminal procedural safeguards.

Question III, posed separately and asking whether procedure under the Act is sufficiently implemented in its actual administration so that the Act may be categorized as a civil procedure, justifying the elimination of conventional criminal procedural safeguards, suggests an approach directly contrary to the assumption made in posing Question II. The Fourth Circuit would seem to have answered its own question (if the Act is applied in accordance with its provisions), since it held that "An examination of the trial and hearing provisions of the Act can leave no doubt that it places around the accused more procedural safeguards than any of the Acts of a similar nature which have been upheld by the courts against this attack" of denial of procedural due process. (334 F.2d 515). After citing a few of these procedural safeguards, the Fourth Circuit concludes that "The procedural protection here furnished exceeds that provided in either the Minnesota Phychopathic Personality Statute or the Virginia Sterilization Act, both of which were upheld by the Supreme Court."

The Fourth Circuit also referred to the attack on the Maryland Act on the grounds that it (i) departs from the common law rules of evidence in permitting experts to testify as to hearsay from any source deemed by the experts to be relevant; (ii) unfairly permits experts to express opinions on the ultimate issue; and (iii) places the burden on the State to prove defective delinquency by only a preponderance of the evidence. The Fourth Circuit appears to dispose

or what he would substitute. (E. 374).

Even Dr. Boslow, Director of Patuxent, testified that he and his Staff, after a number of years of thought as to what definition they could substitute for the language of the Act, had "not been able to come up with anything better. And we have tried." (E. 668; and to the same effect, E. 738).

of these attacks adversely to petitioners, for it says:

"The *answer to all these objections* is that with respect to state action repeated decisions of the Supreme Court *have put it beyond the range of further debate* that the 'due process' clause of the fourteenth amendment has not the effect of imposing upon the state any particular form or mode of procedure, so long as the essential rights of notice and a hearing, or opportunity to be heard, before a competent tribunal are not interfered with. * * *" (334 F.2d 515; emphasis supplied).

"It would, therefore, appear that the Act upon its face provides adequate procedural safeguards; indeed it throws around the accused many safeguards not ordinarily found in so-called civil proceedings. By examining the records of the actual trials of the petitioners, the district court can determine whether in application these safeguards result in basic fairness of procedure imposed upon the State by the fourteenth amendment. We are not here speaking only of the 'perfection of the machinery for correction' which may be referred to as procedural due process. Fay v. Noia, 372 U.S. 391, 421, 83 S.Ct. 822, 839 [9 L.Ed.2d 837] (1963); Cf. Moore v. Dempsey, 261 U.S. 86, 90–91, 43 S.Ct. 265, 67 L.Ed. 543 (1923)." (334 F.2d 516).

The Supreme Court did not in so many words characterize the Minnesota Psychopathic Personality Statute as "civil" or "criminal," but held that the procedural safeguards incorporated in the statute were adequate from a constitutional standpoint. If the safeguards in the Maryland Act exceed those in the Minnesota Act, a fortiori the Maryland Act is constitutional on its face.. Counsel for petitioners have conceded that, as to all except one of the petitioners, procedural due process had been followed and as to that case this Court finds no constitutional deficiency (footnote 7). This would appear clearly to dispose of Question III, and probably of Question II.

(b) In Daugherty v. State of Maryland, 4 Cir. 1966, 355 F.2d 803, a panel of the Fourth Circuit, different from the Sas panel, referred to "Our approval of the Act in Sas v. State of Maryland, supra, 334 F.2d 506 (1964)" which "necessarily included approval ex facie of" the section of that Act then in question (355 F.2d at 804). The Daugherty panel had previously outlined the procedures for a determination of defective delinquency. The court then stated:

"The adjudication, hearing and commitment have been declared to be civil and not criminal in character. See Blizzard v. State, 218 Md. 384, 147 A. 2d 227 (1958)." (355 F.2d 804).

Blizzard expressly required, and contained, a finding that the Act is, "in substantive matters a civil proceeding * * *" and that "[w]e also think it is now quite clear that it is the intention of the General Assembly that such proceedings be regarded as civil in nature as to procedural matters as well." (218 Md. at 386, 147 A.2d 229). The apparent acquiescence of the Fourth Circuit panel two years after the Sas decision in the constitutionality of the interpretation placed by the Court of Appeals of Maryland on the Act is highly significant, if not fully determinative.

The concluding language in Blizzard, 218 Md. at 390, 147 A.2d 231, supporting the conclusion of the Court of Appeals of Maryland is as follows:

"Commitment proceedings under Article 31B (quite properly, we think) throw extensive protections around the person involved therein; and in many respects they are such protections as are afforded to the accused in a criminal case. However, such proceedings do not charge the person involved with any crime. They are not prosecuted on indictment or information, but are based upon a report of a clinical examination. Conviction and sentence for crime are historical facts which are prerequisites to the examination leading up to the commitment proceedings, but there is no issue as to

guilt or innocence of any crime or crimes of which the person involved has already been convicted. (Cf. prosecutions under statutes where a second or subsequent offense may be penalized more severely than a first offense, as in Beard v. State, 216 Md. 302, 140 A.2d 672, and McCoy v. State, 216 Md. 332, 140 A.2d 689). The sole issue is whether the person before the court is or is not a defective delinquent.

"In addition to the authorities from other States cited in the Eggleston case [Eggleston v. State, 209 Md. 504, 121 A.2d 698], we think that the following decisions support or tend to support the view that proceedings under such a statute as our Defective Delinquent Law are civil in nature and should be so regarded for procedural, as well as substantive, purposes: In re Moulton, 96 N.H. 370, 77 A.2d 26; In re Mundy, 97 N.H. 239, 85 A.2d 371; Malone v. Overholzer, Dist.Ct. D.C., 93 F.Supp. 647; Miller v. Overholzer, 92 U.S.App.D.C. 110, 206 F.2d 415; People v. Sims, 382 Ill. 472, 47 N.E.2d 703; People v. Redlich, 402 Ill. 270, 83 N.E.2d 736; and People v. Ross, 344 Ill.App. 407, 101 N.E.2d 112."

██ (c) Having in Question II referred to the Sixth Amendment, and in Question III to the Fourteenth Amendment due process clause, and in connection therewith this Court having been told to determine whether the Act can be categorized as a civil procedure, justifying the elimination of conventional criminal procedural safeguards, the Fourth Circuit in footnote 5 of its opinion states, in part, that this Court is to proceed on the basis that "the arguments as to whether the Act is civil or penal in nature *are futile exercises in semantics.*" (Emphasis supplied). Footnote 5 in toto reads as follows:

"5. Insofar as the basic constitutional rights of the parties to due process are concerned, the arguments as to whether the Act is civil or penal in nature are futile exercises in semantics. An Act which deprives sane men

of their liberty by confining them under severe discipline with or without treatment requires a basic fairness of procedure and substance—'implicit in the concept of ordered liberty'—to comport with the guarantees of our National Constitution. By these standards, the Supreme Court reviewed the Minnesota statute which concededly is as civil in nature as the Maryland statute."

Again, if the words "and found the Minnesota statute constitutional as written", were added, it would seem to require an affirmative answer to Question II and to Question III.

The question of whether or not an act is civil (regulatory) or criminal (penal) in nature, has not usually been regarded as a futile exercise in semantics, but rather as dispositive of the case then under consideration. The Supreme Court, in the very case cited by the Fourth Circuit, Kennedy v. Mendoza-Martinez, 1963, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644, held that the denaturalization statutes in question which automatically imposed forfeiture of citizenship without prior court or administrative proceedings, were "essentially penal in character, and consequently have deprived the appellees of their citizenship without due process of law and without according them the rights guaranteed by the Fifth and Sixth Amendments, including notice, confrontation, compulsory process for obtaining witnesses, trial by jury, and assistance of counsel." (164, 83 S.Ct. 565). At page 168, 83 S.Ct. at page 567 the Court set forth the seven "tests traditionally applied to determine whether an Act of Congress is penal or regulatory in character." These tests were considered by the Circuit Court (Director v. Daniels, 243 Md. 38–40, 221 A.2d 397) and on the basis thereof, as well as its legislative history, the Maryland Act was found to be civil; as the Maryland Court of Appeals had already consistently found in a series of cases beginning with Eggleston v. State, 1956, 209 Md. 504, 121 A.2d 698.

The analysis by the Circuit Court shows such an appreciation of the issues involved, and is so thorough and convincing in its analysis, that a direct quotation is justified if not required (Director v. Daniels, 243 Md. 37–40, 221 A.2d 409).

### "CIVIL NATURE OF THE ACT.

"The Maryland Courts of Appeals in Eggleston v. State, supra, [1956, 209 Md. 504, 121 A.2d 698] decided the Act was regulatory in character and therefore not penal but civil in nature. It becomes vital that there be a proper determination as to the correctness of this conclusion because only if the statute is regulatory can the precise criminal procedures required to uphold the constitutionality of a penal statute be dispensed with. If, on the other hand, the act is regulatory and therefore civil in nature, the Fourteenth Amendment of the Constitution's requirement is met if there is [sic] provided reasonable safeguards under the circumstances which include consideration of the fact that persons may be deprived of their liberty for the good of society and themselves. It seems clear that if there exists affirmative evidence that the act results from a legislative intent to regulate rather than punish, the law is deemed to be civil in nature. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). We conclude from the evidence before us that the legislative history of the Defective Delinquent Act clearly demonstrates that its sole objective and purpose was not penal but an effort to segregate a known group of mentally disordered people who are found guilty of criminal acts, by confining them in an institution housing only members of their group in a sole effort to protect society and provide treatment to effect, if possible, a cure of the illness. From the history it is clear that the legislative imposition of sanctions by restraining the individual results from studies that indicate that such restraint is necessary both for the protection of society and to provide medical treatment to further curative measures. In short, it is the State's effort to determine the cause of a criminal's acts and if associated with mental disorder to accomplish improvement under psychiatric supervision so that he may hopefully be released, no longer a danger to himself or society. This act now before the Court is so similar in design and has a legislative purpose so similar to the act that was before the Supreme Court in Minnesota, ex rel. Pearson v. Probate Court, supra, that we believe the decision of that court upholding the constitutionality of the Minnesota Sexual Psychopath Law is direct authority for our conclusion that this act is civil in nature. We further point out that the purpose of this act is so closely akin to the so-called 'Sexual Psychopath' laws enforced in some twenty (20) states and the District of Columbia, that the decisions of the Courts in those jurisdictions that each of their laws is civil in nature is ample authority to conclude that the Maryland Act is regulatory. State v. Madary, 178 Neb. 383, 133 N.W.2d 583 (1965); People v. Levy, 151 Cal.App.2d 460, 311 P.2d 897 (1957); Miller v. Overholzer, 92 U.S.App.D.C. 110, 206 F.2d 415 (1953); In re Miller, 98 N.H. 107, 95 A.2d 116 (1953). See also cases cited in annotation under 'Sexual Psychopaths,' 24 A.L.R.2d 350.

"Assuming, however, that contrary to our finding here, there exists no conclusive evidence of legislative intent as to whether or not the act is penal or civil in nature, the answer to this question must be determined from the face of the Act after considering the following:

' * * * whether the sanction involves an affirmative disability or restraint; whether it has historically been regarded as a punishment; whether it comes into play only on a finding of scienter; whether its operation will promote the traditional aims of punishment—retribution and deterrence; whether the behavior to which it applies is already a crime; whether an alternative purpose to which it may rationally be connected is assignable for it; and whether it appears excessive in relation to the alternative pur-

pose assigned.' Kennedy v. Mendoza-Martinez, supra.

"After considering these factors, we conclude that the statute on its face supports the conclusion that the act is civil in nature. We find this for the following reasons: Even though the sanction does involve an affirmative restraint it is provided only because it is deemed best for the protection of society and best for the protection and treatment of the individual that he be placed in a maximum security institution maintained solely for defective delinquents and not for other members of the criminal element. Historically, this type of sanction or restraint to accomplish the purposes of the Act has not been regarded as punishment but regulatory and is more akin to those laws consistently held to be civil in nature applicable to the 'sexual psychopaths.' Also this is true of laws involving loss of liberty by restraint of many mentally ill persons in mental hospitals in all of the states. The Maryland Act does not come into play on a finding of 'scienter,' because the person involved must before referral for diagnosis already have been convicted of at least one criminal act and can be determined to be a 'defective delinquent' only after there has been an intensive mental examination. The law on its face clearly shows that it was not enacted to promote the aims of punishment, retribution and deterrence, but its only purpose is for the protection of society, and the treatment of the individual to effectuate a cure if at all possible. The Act clearly demonstrates that 'defective delinquency' is not a crime but is a mental condition that can only be diagnosed and determined to exist after a finding of guilt. There exist alternate purposes which are valid functions of the State as a part of its police power. They are the protection of society, coupled with a humanitarian attempt to treat, cure and rehabilitate those suffering from abnormal mental functioning. The sanctions or incarceration provided by the Act are not excessive in relation to these alternative purposes since most reputable psychiatrists agree that treatment cannot be related to a fixed period of confinement, as the length of time necessary for treatment and cure, if it can be obtained, is uncertain. In addition, experience has demonstrated that the indeterminate confinement is itself therapeutic, as it has a tendency to generate and motivate the individual to participate in the institutional program in order to help himself.

"Based on the testimony, we fear that without the indeterminate provision in the Act, violence would be done to its basic concepts and purposes, and much of the good sought by this legislation would go for naught. The very qualities making up the nature of an individual at Patuxent, with his warped attitudes and distorted outlook, would dictate to him that he antisocially wait out his allotted time, resisting introspection and any kind of reappraisal of his makeup, and refusing to cooperate in receiving available therapy to any degree that would give promise of his ultimate rehabilitation.

"We find that on the basis of present psychiatric and psychological knowledge, it can be accurately predicted that certain individuals will commit crimes. In cases where it is believed that a person at Patuxent still maintains his propensity for crime, it would be a tragic destruction of the purposes of this legislation, a disservice to society and not the least of the errors, a serious injustice to the individual to release him, uncured.

"We therefore conclude that the Maryland Defective Delinquent Act is civil in nature under either test; that is, such a conclusion results from the legislative history and also the Act on its face supports this finding after taking into account the tests laid down by the Supreme Court in *Kennedy*."

Petitioners contend that Director v. Daniels, 1966, 243 Md. 16, 221 A.2d 397, supra, was incorrectly decided, particularly in view of Baxstrom v. Herold, 1966, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed. 2d 620 (decided after the Circuit Court decision but before that of the Maryland

Court of Appeals) and Specht v. Patterson, 1967, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 and In re Gault, 1967, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (both decided after the decision of the Maryland Court of Appeals).

Baxstrom v. Herold, 1966, 383 U.S. 107, 86 S.Ct. 760, was concerned with the Equal Protection clause of the Fourteenth Amendment. The case held the New York statutory procedure under which a person could be civilly committed at the expiration of a prison sentence without the jury review available to all others civilly committed, and where commitment could be to an institution maintained by the Department of Correction beyond the expiration of said person's prison term without the judicial determination that he was dangerously mentally ill such as that afforded all those so committed except those nearing the end of a penal sentence, was a denial of the equal protection clause of the Constitution.

The decision has no relevance to the Maryland Act, which provides, among other protections to be mentioned shortly, for a jury trial to determine defective delinquency, and for representation by counsel in such proceedings, which was not true in the Baxstrom proceedings. Further, the Supreme Court stated (383 U.S. at 111, 86 S.Ct. at 763):

" * * * Classification of mentally ill perons as insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill *at all* * * * " (Court's emphasis).

In Specht v. Patterson, 1967, 386 U.S. 605, 87 S.Ct. 1209, petitioner had been convicted for indecent liberties under one Colorado statute carrying a maximum sentence of ten years, "but not sentenced under it." Instead, he was sentenced under the Colorado Sex Of-

fenders Act "for an indeterminate term of from one day to life without notice and full hearing." (386 U.S. at 607, 87 S.Ct. at 1211). The Sex Offenders Act could be brought into play if the trial court was of the opinion that any person convicted of specified sex offenses constituted a threat of bodily harm to members of the public, or was an habitual offender and mentally ill. Punishment for an indefinite term could be imposed if a complete psychiatric examination had been made, and a complete written report submitted to the district court, containing all facts and findings, and a recommendation.

"This procedure was followed in petitioner's case; he was examined as required and a psychiatric report prepared and given to the trial judge prior to the sentencing. But there was no hearing in the normal sense, no right of confrontation and so on." (386 U.S. at 608, 87 S.Ct. at 1211).

The Supreme Court reaffirmed Williams v. New York, 1949, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337, holding that the Due Process Clause of the Fourteenth Amendment did not require a judge to have hearings and to give a convicted person an opportunity to participate in those hearings in determining the imposition of sentence.[11] *Williams* was distinguished from *Specht* in that in *Williams* the sentencing was at the end of the trial and in the same proceeding fixing the penalty, while in *Specht* there was the making of a new charge leading to criminal punishment.

The Supreme Court said (386 U.S. 608–609, 87 S.Ct. 1211—footnote 1 omitted):

"We adhere to Williams v. People of State of New York, supra; but we decline the invitation to extend it to this radically different situation. These commitment proceedings whether denominated civil or criminal are subject both to the Equal Protection Clause of the Fourteenth Amendment

11. The language of Mr. Justice Douglas at 386 U.S. 606, 87 S.Ct. 1209, is a little difficult to reconcile with a defendant's right of allocution.

as we held in Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620, and to the Due Process Clause. We hold that the requirements of due process were not satisfied here.

"The Sex Offenders Act does not make the commission of a specified crime the basis for sentencing. It makes one conviction the basis for commencing another proceeding under another Act to determine whether a person constitutes a threat of bodily harm to the public, or is an habitual offender and mentally ill. That is a new finding of fact (Vanderhoof v. People of State of Colorado, 152 Colo. 147, 149, 380 P.2d 903, 904) that was not an ingredient of the offense charged. The punishment under the second Act is criminal punishment even though it is designed not so much as retribution as it is to keep individuals from inflicting future harm. United States v. Brown, 381 U.S. 437, 458, 85 S.Ct. 1707, 1720, 14 L.Ed.2d 484."

The Supreme Court then expressed its approval of the decision of the Third Circuit in United States ex rel. Gerchman v. Maroney, 3 Cir. 1966, 355 F.2d 302, 312, and continued (386 U.S. 610–611, 87 S.Ct. 1212):

" * * * Under Colorado's criminal procedure, here challenged, the invocation of the Sex Offenders Act means the making of the new charge leading to criminal punishment. The case is not unlike those under recidivist statutes where an habitual criminal issue is 'a distinct issue' (Graham v. [State of] West Virginia, 224 U.S. 616, 625 [32 S.Ct. 583, 56 L.Ed. 917]) on which a defendant 'must receive reasonable notice and an opportunity to be heard.' Oyler v. Boles, 368 U.S. 448, 452 [82 S.Ct. 501, 504, 7 L.Ed.2d 446]; Chandler v. Fretag, 348 U.S. 3, 8 [75 S.Ct. 1, 99 L.Ed. 4]. Due process, in other words, requires that he be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own. And there must be findings adequate to make meaningful any appeal that is allowed. The case is therefore quite unlike the Minnesota statute [3]

3. "The Minnesota statute (Chapter 369 of the Laws of Minnesota of 1939) provided that the laws relating to persons found to be insane were to apply to 'persons having a psychopathic personality.' It defined the term 'psychopathic personality' as meaning the existence in a person of certain characteristics which rendered him 'irresponsible for his conduct with respect to sexual matters and thereby dangerous to other persons.' The statute was not criminal in nature, and was not triggered by a criminal conviction. A person found to have a 'psychopathic personality' would be committed, just as a person found to be insane. See Mason's Minn.Stat. c. 74, § 8992–176 (1938 Supp.)."

we considered in [State of Minnesota ex rel. Pearson v. Probate Court, of Ramsey County, Minn.] 309 U.S. 270 [60 S.Ct. 523, 84 L.Ed. 744], where in a proceeding to have a person adjudged a 'psychopathic personality' there was a hearing where he was represented by counsel and could compel the production of witnesses on his behalf. Id., at 275 [60 S.Ct. 523]. None of these procedural safeguards we have mentioned is present under Colorado's Sex Offenders Act. We therefore hold that it is deficient in due process as measured by the requirements of the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400 [85 S.Ct. 1065, 13 L.Ed.2d 923]."

As will be seen, the Maryland Act provides all the due process requirements set forth in the last quoted text language,[12] whether the Maryland Act be regarded as civil or criminal.

12. Except perhaps as to the making of "findings." It is not clear whether the Supreme Court meant that in jury cases special findings of fact were required, or whether answers to interrogatories would suffice; or merely whether the record must be sufficient to support a general verdict. It is believed that the Maryland practice under which a jury determines defective delinquency vel non, on

In re Gault, 1967, 387 U.S. 1, 87 S.Ct. 1428, the Supreme Court passed upon the Constitutional safeguards applicable to "procedural requirements at the adjudicatory stage." [13] and was not "concerned with the procedures or constitutional rights applicable to the pre-judicial stages of the juvenile process * * * nor * * * to the post-adjudicative or dispositional process." [14] The decision was limited to "the proceedings by which a determination is made as to whether a juvenile is a 'delinquent' as a result of alleged misconduct on his part, with the consequence that he may be committed to a state institution." [15]

The Court then held that the proceedings in question did not "measure up to the essentials of due process and fair treatment" [16] in that:

1. Inadequate notice of the charges was given.

2. There was a failure to advise as to right to counsel.

3. There was a denial of rights of confrontation, cross-examination, and there was non-observance of the privilege against self-incrimination.

As to right to appeal, and to a transcript, the Supreme Court said, quoting from Griffin v. Illinois, 1956, 351 U.S. 12, 18, 76 S.Ct. 585, 611, 100 L.Ed. 891, that:

"This Court has not held that a State is required by the Federal Constitution 'to provide appellate courts or a right to appellate review at all.'" [17]

Most of petitioners' contentions relate to the pre-adjudicatory and post-adjudicatory parts of the Maryland Act, so that In re Gault is not apposite. As will be shown, these aspects, as well as the adjudicatory aspect, measure up to the essentials of due process and fair treatment.

Procedural Requirements of the Act.

The procedural provisions of the Act, and the availability of discovery procedures, have been summarized in the opinion in the Daniels case as follows (243 Md. 43–44, 221 A.2d 413):

"The procedural requirements of the Act include these safeguards to the defendant:

"1. He must be convicted and sentenced in a Maryland Court for a crime.

"2. The crime must be of a particular category: (a) a felony or (b) a misdemeanor punishable by imprisonment in the penitentiary or (c) one

---

instructions by the trial court as to the elements, nature and meaning of the term would meet this aspect of due process.

One of the inmates of Patuxent (whose access to recent decisions exceeds that of this Court) has called this Court's attention to the 2–1 decision of a panel of the District of Columbia Court of Appeals in Millard v. Harris, D.C.Cir. 1968, 406 F.2d 964, from which he quotes certain language questioning the constitutionality of the procedural provisions of the District of Columbia Sexual Psychopath Act insofar as it relates to commitment proceedings. In this respect the District of Columbia Act appears somewhat to resemble the Colorado Sex Offenders Act found procedurally defective in Specht v. Patterson, 1967, 386 U.S. 605, 87 S.Ct. 1209. The majority in the Millard case did not, however, pass upon the constitutionality of the District of Columbia Act, but reviewed the evidence and found that the Act was not applicable to appellant, because if released he would not be dangerous to others because of *sexual* misconduct. (This Court is not in accord with this conclusion reached despite the findings that appellant was prone to physical violence, and probably would engage in exhibitionism and public masturbation, which most women would find repulsive, although "their distress would be brief", and depending upon their sensitivity they might be "quite upset" but "for *only* 'two or three days'" [this Court's emphasis] and that such conduct might cause serious psychological harm to small children. This Court can only be thankful that his family does not reside in the District of Columbia).

13. Footnote 48, 387 U.S. at 31, 87 S.Ct. at 1445.

14. 387 U.S. at 13, 87 S.Ct. at 1436.

15. 387 U.S. at 13, 87 S.Ct. at 1436.

16. 387 U.S. at 30, 87 S.Ct. at 1445.

17. 387 U.S., at 58, 87 S.Ct. at 1459.

of violence, or (d) a sex crime involving physical force, disparity of age, or of an uncontrolled or repetitive nature, or (e) two or more convictions for offenses punishable by imprisonment in a criminal court of this State.

"3. There must be a request for examination by: (a) the Department of Correction, (b) the State's Attorney's office, (c) such person himself, (d) his attorney, or (e) the Court.

"4. The Court must order the examination.

"5. A copy of the order for examination must be served on the person to be examined.

"6. The person must still be confined.

"7. The examination must be made by at least three persons, one of whom must be (a) a medical physician, one a (b) psychiatrist and one a (c) psychologist.

"8. A majority of the examiners must conclude that a person is a defective delinquent.

"9. The person is entitled on request to be examined by a private psychiatrist of his own choice at the expense of the State unless he, himself, has asked for the original examination.

"10. The person must, after the examination with an affirmative result be brought before the Court and advised of the substance of the report and the pendency of the hearing.

"11. He is entitled to counsel of his choice, or to competent counsel appointed by the Court.

"12. Counsel has access to all records, reports and papers of the institution relating to the person and to all papers in the possession of the Court bearing on his case.

"13. The person has a choice of a court or jury trial.

"14. He may make application for leave to appeal from the order holding him to be a defective delinquent, although such appeal does not lie as a matter of right.

"He, in addition to the specific statutory safeguards, has full opportunity to summon witnesses and to present evidence. Also, he has available to him all discovery procedure permitted under the Maryland Rules in civil cases, which is much broader than in criminal cases, including the taking of depositions, the use of interrogatories and demands for admission of facts.

' * * * An examination of the trial and hearing provisions of the Act can leave no doubt that it places around the accused more procedural safeguards than any of the Acts of a similar nature which have been upheld by the Courts against this attack.' Sas v. Maryland, supra. Also see Minnesota ex rel. Pearson v. Probate Court, supra, and Buck v. Bell, supra [274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000]."

A brief consideration of some of the constitutional guarantees, in relation to the Act, follows:

1. Right to Confrontation.

██ Even in strictly criminal cases, personal confrontation is not always necessary. Pointer v. Texas, 1965, 380 U.S. 400, 407, 85 S.Ct. 1065, 13 L.Ed.2d 923, particularly where the accused has the opportunity to rebut preliminary findings, and could himself have subpoenaed witnesses. Gonzales v. United States, 1960, 364 U.S. 59, 64, 66, 80 S.Ct. 1554, 4 L.Ed.2d 1569. The Supreme Court in Solesbee v. Balkcom, 1950, 339 U.S. 9, 70 S.Ct. 457, 94 L.Ed. 604, reiterated the "necessary and inherent differences between trial procedures and post-conviction procedures such as sentencing" (page 12, 70 S.Ct. page 459), and was unwilling to hold that the absence of "provisions for an adversary hearing in which a convicted defendant can be present by friends, attorneys, or in person, with the privilege of cross-examining witnesses and offering evidence", invalidated Georgia statutory provisions

for determining the sanity of a convicted person (page 13, 70 S.Ct. page 459).[18]

In Kay v. United States, 4 Cir. 1958, 255 F.2d 476, a criminal case dealing primarily with exceptions to the hearsay rule, the Fourth Circuit stated that the admission of a certificate as to a blood test for alcohol "did not deprive the defendant of his right of confrontation by witnesses" (255 F.2d at 480).

Under the provisions of the Maryland Act, in a determination of defective delinquency the one involved is entitled to counsel, who has access to all records, reports and papers of Patuxent relating to that person; and under the holding in Brunson v. Director, 1965, 239 Md. 128, 130, 210 A.2d 372.

"There was no denial to applicant of the right of confrontation of witnesses. Ash v. Director, 237 Md. 443, 206 A.2d 706. The words in Code (1964 Cum.Supp.). Art. 31B, Sec. 10 (a) (the section dealing with the procedures as to redetermination of defective delinquency), that 'any party in interest shall have the right * * to process to compel the attendance of witnesses' were omitted from Sec. 8 (a) when the Legislature repealed and re-enacted Sec. 8 by Ch. 283 of the Laws of 1963 to prescribe the procedures as to an original determination of defective delinquency, including the right of counsel for the accused to see all reports well in advance of trial. Since the quoted words declared the obvious—8 Wigmore, Evidence, Sec. 2192 (3rd Ed. 1940), p. 64: 'For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanction by Lord Hardwicke) has a right to every man's evidence,' and Md. Rule 114a—their omission from the reenacted Sec. 8 did not affect the right of the prospective defective delinquent to have any available person, whose name appeared on any report considered by the Patuxent authorities or used as a basis for testimony in court, summoned to appear in court. Faulkner v. Director, 230 Md. 632, [187 A.2d 473]. The applicant did not seek to summon any person whose report was utilized by Dr. Boslow and cannot justly complain now."

Moreover, as pointed out in Purks v. State, 1966, 226 Md. 43, 49, 171 A.2d 726, and Director v. Daniels, supra, 243 Md. 16, 44, 221 A.2d 397, 413, the subject of a defective delinquency hearing also "has available to him all discovery procedure permitted under the Maryland Rules in civil cases, which is much broader than in criminal cases, including the taking of depositions, the use of interrogatories and demands for admission of facts."

These statutory and judicially recognized safeguards fully protect the right, if any, of a party to a defective delinquency hearing to a confrontation of witnesses against him.

2. Use of Hearsay.

3. Expression of Opinion by Experts on Ultimate Issue.

4. Burden on State to Prove Defective Delinquency only by a Preponderance of the Evidence.

As to these very issues, the Fourth Circuit said:

"The answer to all these objections is that with respect to state action repeated decisions of the Supreme Court have put it beyond the range of further debate that the 'due process' clause of the fourteenth amendment has not the effect of imposing upon the states any particular form or mode of procedure, so long as the essential right of notice and a hearing, or opportunity to be heard, before a competent tribunal are not interfered with * * *" (334 F.2d 515).

Since the Maryland Act, and the interpretation thereof by the highest courts of that State, not only do not interfere with, but grant effective rights

18. To the same effect, see Caritativo v. California, 1958, 357 U.S. 549, 78 S.Ct. 1263, 2 L.Ed. 2d 1531.

of notice and a hearing, or opportunity to be heard, before a competent tribunal, the Act is not vulnerable on any or all of the above grounds.[19]

5. Right to Counsel.

As the right to counsel at a hearing (or rehearing) in court to determine delinquency is fully established, this contention must relate to the absence of counsel during the various proceedings at Patuxent preliminary to a recommendation with respect to delinquency, either as to an initial determination, or a subsequent redetermination. In effect, it is urged that before *any* interrogation of an inmate committed for study can be made, he must be advised of his rights under Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and particularly his right to have an attorney present during all questioning.[20]

Apart from the fact that Miranda is not to be applied retroactively [21] there are several reasons why failure to advise of a right to counsel,[22] or to furnish counsel, *is not a violation of rights in the institution-examination stage.* The proceeding is not accusatorial; it is not designed to elicit evidence or proof of guilt, for the patient has already been convicted. The purpose is to determine the appropriate type of punishment or treatment.

This question was considered, and well answered, by the Maryland Court of Special Appeals in Wise v. Director, 1967, 1 Md.App. 418, 421–422, 230 A.2d 692, cert. den. 1968, Wise v. Boslow, 390 U.S. 1030, 88 S.Ct. 1420, 20 L.Ed.2d 286, where the court said:

" * * * At the outset, it must be observed that the psychological and psychiatric examinations that are performed at Patuxent are not accusatorial stages of a criminal proceeding and do not constitute the type of 'in-custody' interrogation with which the Supreme Court was concerned in Miranda. Furthermore, the purpose of the stage of the defective delinquent proceeding that is being attacked herein is not to determine or to gain evidence to prove that the subject has committed a crime, but rather to discover the inmate's mental and emotional condition. Defective delinquency proceedings are civil in nature, Director v. Daniels, 243 Md. 16, [221 A.D.2d 397] (1966), and as the applicant's statements do not subject him

19. The rights of notice and a hearing, or opportunity to be heard, before a competent tribunal having been effectively provided and recognized, the unavailability of any of the three objections would appear clearly to be beyond the range of further debate.

However, it may not be, and certainly is not intended to be, an act of supererogation to mention that the hearsay question is dealt with in Daniels, 243 Md. 44–46, 221 A.2d 397; and see Kay v. United States, 4 Cir. 1958, 255 F.2d 476, 480–481; Thomas v. Hogan, 4 Cir. 1962, 308 F.2d 355 (civil; hospital records recognized exception to hearsay; doctor may express opinion as to whether a person was "drunk"). See also, Crawford v. Director, 4 Cir. 1965, No. 10,178. In this habeas corpus proceeding, it was contended that the only testimony on defective delinquency was that of Dr. Boslow. With respect to this question, the Maryland Court of Appeals had held in Crawford v. Director, 1964, 236 Md. 659, 205 A.2d 210, that Dr. Boslow's testi-mony (which included hearsay) was sufficient. The Fourth Circuit said:

"We perceive no federal question here since Crawford admits that his defective delinquency adjudication was not totally devoid of evidentiary support."

20. The right to keep silent, and the other Miranda rights, are considered under the next heading.

21. Johnson v. New Jersey, 1966, 384 U.S. 719, 733, 86 S.Ct. 1772, 16 L.Ed.2d 882. This would adequately dispose of all present petitioners, but would simply postpone decision of the point.

22. Some of the petitioners, and many others detained in Patuxent, are in fact represented by lawyers. The effect of such representation in attempting to interview inmates is also discussed under the next heading. It might be noted, however, that one of the psychiatrists called on behalf of Daniels stated that "he had a hunch that in some ways" Daniels' attorney "had been treating him." (E. 368).

to criminal liability, there is no constitutional infirmity in the manner in which the examination at Patuxent was conducted, McCloskey v. Director, 245 Md. 497, [226 A.2d 534]. And a person undergoing examination at Patuxent has no absolute right to remain silent. State v. Musgrove, 241 Md. 521, [217 A.2d 247].[23]

"We have studied carefully the Supreme Court's recent decision in Specht v. Patterson, 386 U.S. 605, [87 S.Ct. 1209] 18 L.Ed.2d 326 (April 11, 1967), and we conclude that the applicant's examinations at Patuxent did not offend standards of due process as enunciated in that decision."

■ The Fourth Circuit in United States v. Albright, 4 Cir. 1968, 388 F.2d 719, has held that where the issue of insanity is involved, a "district court has ample authority to order defendant to submit to a psychiatric examination" (388 F.2d 723). A fortiori would seem to be the right to require one committed to Patuxent to take a psychiatric examination, the purpose and effect of which would not be in and of itself a commitment to Patuxent, but might result in a staff finding that the person was not a defective delinquent, or would lead to a trial to determine whether or not the person was a defective delinquent—all ancillary to the determination, not of guilt or innocence of a crime, but of the proper disposition of a person already convicted of a crime.

The Fourth Circuit in Albright also held that a defendant has no constitutional right to have an attorney present during a psychiatric examination, saying (388 F.2d 726):

"State v. Whitlow, supra, 45 N.J. 3, 210 A.2d 763 holds that a defendant has no federal or state constitutional right to have his attorney present during a psychiatric examination conducted at the instance of the prosecutor. In this conclusion we agree. From the intimate and personal nature of the examination, we are satisfied that, except in the unusual case, the presence of a third party, in a legal and non-medical capacity, would severely limit the efficacy of the examination, and that if defendant's privilege against self-incrimination is given full effect with regard to his inculpatory statements to his examiner, the need for the presence of an attorney is obviated."

■ This Court accordingly, holds that no constitutional right is violated where an inmate of Patuxent is interrogated and/or examined for purpose of diagnosis, staff finding as to defective delinquency, and the making of a report to the referring court, without counsel being present.

6. Right to Remain Silent.

■ The proceedings before this Court establish, and this Court finds as a fact, that no resort to punitive measures occurs when a person referred for examination refuses to answer questions or to submit to an examination. True, he is not permitted to engage in group therapy, since his status as a defective delinquent, for whom the treatment procedures of Patuxent are intended, has not been established, and the establishment of his status is indefinitely postponed, but as a result of his own conduct.

As to procedure, this Court finds that in ordinary course a suspected defective delinquent is ordered to report for examination. If, on reporting, he states that he is represented by counsel, he is permitted to return to his cell, and no

---

23. This Court would not so have described the holding in Musgrove, 241 Md. 521, 217 A.2d 247. To this Court Musgrove in effect holds that an interview and examination are essential for the required institutional finding and report, and that refusal to submit to examination, resulting in the inability to make such finding and report, may lead to the indeterminate detention of the person referred to Patuxent for examination and report, without any hearing (a hearing having been made impossible by such conduct) on whether in fact he is or is not a defective delinquent.

effort further to interrogate him is made, until he or his counsel indicates his willingness. If one not represented by counsel is ordered to report and does so, but states his unwillingness to answer questions or be examined, he is permitted to return to his cell. Thereafter he may be directed from time to time to report to his physician for examination. If he reports, and declines to answer, or be examined, no disciplinary action is taken. If he refuses to report he may be disciplined for failure to obey an order.[24]

This procedure, well within the limits considered in United States v. Albright, 4 Cir. 1968, 388 F.2d 719, supra, contravenes no rights of petitioners.

7. Right against Self-Incrimination.

The absolute indispensability of a personal examination of one as to whom a mental appraisal is to be made seems incontestable.[25] However, the privilege against self-incrimination "can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory * * * it protects any disclosure which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used."[26]

However, as held in Wise v. Director, 1967, 1 Md.App. 418, 422, 230 A.2d 692, 694, cert. den. 1968, Wise v. Boslow, 390 U.S. 1030, 88 S.Ct. 1420, (above quoted) "the purpose of the stage of the defective delinquent proceeding that is being attacked herein[27] is not to determine or to gain evidence to prove that the subject has comitted a crime, but rather to discover the inmate's mental and emotional condition."

Moreover, the Fourth Circuit has expressly held that "a defendant's right not to incriminate himself is not violated *per se* by requiring him, in an appropriate case, to submit to a mental examination." United States v. Albright, 4 Cir. 1968, 388 F.2d 719, 723. That case involved a hearing as to sanity in a criminal case, in which the question of guilt or innocence had not been determined. In the instant case, determination of guilt (of one or more specified crimes) is a condition precedent. If a *compulsory* examination under Albright is not a violation of the right against self-incrimination, certainly examinations at Patuxent would not be. The careful consideration of the problem by the Fourth Circuit justifies rather extensive quotations:

"* * * But with the advance of medical science in general, and the study and knowledge of mental illness in particular, we would unduly limit the ability of a court to find the truth in a criminal case where sanity is an issue were we to turn our backs on the tool of expert medical knowledge. Rather, the use of expert medical opinion is to be encouraged. Alexander v. United States, supra [8 Cir.], 380 F.2d [33] at p. 39; Pope v. United States, supra [8 Cir.], 372 F.2d [710] at pp. 720–721; State v. Whitlow, 45 N.J. 3, 210 A.2d 763 (1965). We hold, therefore, that the district court had ample authority to order defendant to submit to a psychiatric examination. We turn next to a consideration of whether such an examination violated his Fifth Amendment rights.

"Explicit in Pope v. United States, supra, and implicit in Winn v. United

---

24. Tr. 305–309. Petitioner Avey himself testified that there was no punishment for not talking. Tr. 40.

25. United States v. Albright, 4 Cir. 1968, 388 F.2d 719, 725; State v. Musgrove, supra, 241 Md. 521, 530–532; E. 131, 140, 173, 258, 267; Tr. 275, 278, 414–415, 469.

26. Murphy v. Waterfront Commission, 1964, 378 U.S. 52, 94, 84 S.Ct. 1594, 12 L.Ed.2d 678; quoted in re Gault, supra, 387 U.S. 1, 47–48, 87 S.Ct. 1428, 1454.

27. Psychological and psychiatric examinations at Patuxent, to permit a determination and finding by the Staff as to whether or not the subject is a defective delinquent.

States, supra, is the ruling that a defendant's right not to incriminate himself is not violated *per se* by requiring him, in an appropriate case, to submit to a mental examination. We adopt the rule in this circuit on the authority of those cases and the following considerations:

"The manifest purpose of the examination in this case was, and the proper objective of a mental examination in any criminal case where a defendant's sanity is in issue should be, to obtain knowledge not about facts concerning defendant's participation in the criminal acts charged, but about facts concerning a defendant which are themselves material to the case. Cf. United States v. Wade, 388 U.S. 218, 219, 222, 87 S.Ct. 1926, 18 L.Ed. 2d 1149 (1967). The purpose is not to prove by evidence wrested from a defendant whether he is guilty as charged but, rather, to prove whether a defendant possesses the requisite mentality to be guilty as charged, assuming that his guilt is otherwise established, or whether, legally, he cannot be held criminally responsible, irrespective of what other proof may establish he has done. The 'testimonial' or 'communicative' test of what is and what is not within the privilege against self-incrimination, invoked in Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), is not an appropriate distinction to be applied in the case at bar, but that test is not absolute because, as stated in *Schmerber*, it is only 'a helpful framework for analysis,' '[T]here will be many cases in which such a distinction is not readily drawn.' 384 U.S. 764, 86 S.Ct. 1832.

"In Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892), the principle was stated that the privilege against self-incrimination 'is as broad as the mischief against which it seeks to guard.' The underlying purposes of this Fifth Amendment protection have been recently restated in Miranda v. State of Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), in the portion of the Court's opinion set forth in the margin.[7] We are of the

"7. ' * * * the privilege against self-incrimination—the essential mainstay of our adversary system—is founded on a complex of values, Murphy v. Waterfront Comm., 378 U.S. 52, 55–57, n. 5, 84 S.Ct. 1594, 1596–1597, 12 L. Ed.2d 678 (1964); Tehan v. [United States ex rel.] Shott, 382 U.S. 406, 414–415, n. 12, 86 S.Ct. 459, 464, 15 L.Ed.2d 453 (1966). All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a "fair state-individual balance," to require the government "to shoulder the entire load," 8 Wigmore, Evidence 317 (McNaughton rev.1961), to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. Chambers v. [State of] Florida, 309 U.S. 227, 235–238, 60 S.Ct. 472, 476–477, 84 L.Ed. 716, 722 (1940). In sum, the privilege is fulfilled only when the person is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will." Malloy v. Hogan, 378 U.S. 1, 8, 84 S:Ct. 1489, 1493, 12 L.Ed.2d 653 (1964)' 384 U.S. 460, 86 S.Ct. 1620."

view that those purposes were served and not defeated by requiring the examination in this case." (388 F.2d at 723–724).

* * * * *

"Not only to enable the government to carry its full load, but also to respect the inviolability of the human personality, the examination here was indicated. Should defendant's claim of self-incrimination be upheld, the government, to meet its burden of proof, would have access to only three kinds of proof: cross-examination of defendant's experts, lay testimony, and testimony of government experts predicated upon courtroom observations and hypothetical questions. Medical

science, as Rollerson v. United States, 119 U.S.App.D.C. 400, 343 F.2d 269 (1964), eloquently recognizes, deems these poor and unsatisfactory substitutes for testimony based upon prolonged and intimate interviews between the psychiatrist and the defendant. Half truths derived from these unsatisfactory substitutes do more to violate human personality than full disclosure, especially because there is always the possibility that the psychiatrist who examines for the government and thus has full knowledge of a defendant, may corroborate his contention that he is legally insane.

"Lastly, we comment that the purpose and result of the examination is not 'the cruel, simple expedient of compelling it [incriminating evidence] from his own mouth.' To repeat an earlier statement, the purpose of the examination is not to determine whether a defendant did or did not do the criminal acts charged, but whether he possessed the requisite mental capacity to be criminally responsible therefor, if other proof establishes that he did do them. So limited, we find nothing in the examination, over a defendant's objection, to violate a defendant's privilege against self-incrimination." (388 F. 2d at 724–725).

This court accordingly holds that the examination procedures at Patuxent do not violate any right against self-incrimination. This Court entertains no doubt as to this conclusion; but were there any question it would not make the Maryland Act unconstitutional. An ob-

time of any later attempt to use such information in any proceeding to convict for crime.[28]
jection, if valid, could be made at the

8. Double Jeopardy.

In Director v. Daniels, supra, 243 Md. 16, 221 A.2d 397, the Circuit Court, in its opinion adopted by the Maryland Court of Appeals, summarily disposes of the double jeopardy question by saying (243 Md. 47, 221 A.2d 415):

"The short answer to the petitioner's objection is that the commitment to Patuxent was a civil proceeding and does not involve his being placed in jeopardy for the commission of a crime."

Whether the "short answer" is the complete answer may be questioned, although this Court is in agreement with the conclusion that the Patuxent proceedings do not constitute double jeopardy. Whatever the nature of the proceedings, it is not a retrial of the criminal conviction, or a trial "for the same offense." The question is what shall be done with the already convicted person; shall he serve in an ordinary jail-type institution the sentence already imposed, or for his sake and that of the community shall he be institutionalized?

As the Maryland Court of Appeals stated in Eggleston v. State, 1956, 209 Md. 504, 121 A.2d 698, with reference to the Act:

" * * * The statutory emphasis is on confinement and treatment rather of these persons rather than on punishment or deterrence * * * " (513, 121 A.2d 702).

---

28. This Court has reservations as to the wisdom, as distinguished from the legality, of examinations relating to the circumstances of the crime for which the inmate was convicted, if there is pending a motion for a new trial, or if the conviction is on appeal. However, the inmate could refuse to be examined, or to answer such questions; and objection could be made to the use if a new trial were granted, of any material disclosed without an understanding and voluntary waiver.

Article 35, section 13A of the Maryland Code of Public General Laws, provides that communications between a patient and a psychologist, psychiatrist or other patients shall be privileged "in civil and criminal proceedings" with certain exceptions, one being "in all phases of any civil or criminal proceedings under Article 31B of this Code relating to defective delinquency proceedings."

"The detention is not by way of punishment for a crime, but is preventive and therapeutic." (515, 121 A.2d 703).

This Court holds that determination and redetermination proceedings under the Maryland Act do not amount to double jeopardy.[29]

IV. "[W]hether the interpretation and application of the statutory requirement that a defective delinquent be found to be 'an actual danger to society' may within the eighth amendment's prohibition against cruel or unusual punishment include those whose conduct indicates no more than a danger to property rights as distinguished from violence to the person."

Whether those who participated in the drafting, and the discussions leading to the drafting, of the Maryland Act, anticipated that the Act would extend to conduct defined "to include danger to property as well" as dangerous to life and limb may be a real question.[30] The Maryland Court of Appeals, in Eaton v. Director, 1965, 240 Md. 35, 38, 212 A.2d 497, has held that "one who commits crimes against property may be found a defective delinquent. Cowman v. State, 220 Md. 207, 151 A.2d 903."

Cowman, so cited, was a case in which the defendant had a record of grand larceny, larceny after trust, stealing, embezzlement and victimizing people. Defendant's own psychiatrist testified to defendant's emotional unbalance, and that he would follow antisocial patterns.

In holding that defective delinquency was not limited to crimes against the person, the court added the following important caveat. (220 Md. 212, 151 A.2d 906):

" * * * It may well be that there are some crimes, or series of crimes, so trivial as to pose no actual danger to society. Repeated incarcerations for being drunk and disorderly, for example, might threaten no actual danger to the person or property of others, but rather to the individual himself. But where it is shown that the alcoholism is a symptom of emotional unbalance, and that the propensity towards anti-social and criminal conduct stems from the latter condition, we think the Act is applicable, even though no threat to violence is posed."

Critical to the answer to the question posed by the Fourth Circuit is its limitation to the questioned propriety of treating as defective delinquents "those whose conduct *indicates no more* than a danger to property rights * * *" (emphasis added).

But is is impossible to "draw any hard and fast line between damage to property and danger to individual, damage to a person." [31]

The witnesses before the Circuit Court were in agreement that arson in and of itself was dangerous to life and limb.[32]

Likewise, the burglar is a prime risk of injury to person, particularly as to sex crimes, such as rape. The "breaking and entering" associated with prop-

---

29. The Patuxent proceedings are for the purpose of determining what kind of "sentence" should ultimately be imposed. Its protective provisions are far greater than those involved in sentencing under the Youth Corrections Act, 18 U.S.C. section 5010 et seq., under which a person committed for study, examination and report may ultimately be given any sentence (or placed on probation) as if he were an adult; or may be sentenced, or placed on probation, under the Youth Corrections Act.

30. Guttmacher, E. 174.

31. Judge William S. Thomas, Circuit Court for Cuyahoga County (Cleveland) Ohio. (E. 710).

32. Guttmacher, E. 175; Menninger, E. 323–324; Boslow, E. 665. This conclusion would seem to this Court to be inescapable. The arsonist is not likely to care whether the property is or is not occupied; whether the fire will spread to occupied property; whether the owner or occupant will resist; whether firemen will be killed or injured in fighting the fire.

erty, is easily transferred to the female body.[33]

Moreover, a property offense—a breach of the law—can easily lead to willingness to break another law—an offense to the person.[34] This was forcefully expressed by Dr. Karl A. Menninger:

"As you sort of hinted, lawyers and the Judge took issue about it, when you have to write a statute about it you can't split hairs too much about what is dangerous, for this reason:

"If you break one law, if you have nerved yourself up to defy social regulations and defy the order and break one law, a sudden shift in the situation is very likely to precipitate the breaking of another law.

"As you very well know, in many—how many men I see and examine and sometimes treat, how many of them have said, 'if she had not screamed I wouldn't have done it'? Many prisoners start out with the idea of taking something, they are detected, they panic and then a subsequent act occurs which is very dangerous. So that if you could just do it in a classroom or academically you could say damage to property is really not a danger. I don't know whether that could be argued because, (T. 393) after all—I have to think a little bit about the construction of the word danger there but certainly the possibility of the impulse to shortcut social prescription does not stop to make these fine distinctions—does not always stop to make these fine distinctions in times of crisis. It is awfully hard to say no person has ever been injured, therefore this fellow is not dangerous because—. I don't know if I can make that any clearer. My view is that I can see an argument, I mean I can imagine some-

body saying that property damage is not danger, it is a nuisance, it can be made up by money, you can work it out. It can be made up by restitution. It does not constitute a danger if it is made many times.

"Check forgeries, for instance. If a man forges a hundred checks, does that make him dangerous? Most of us would say perhaps, I doubt it. But a hundred break-and-enters a man who had done a hundred or ten break-and-enters I would say it does make him dangerous because there is a kind of motor activity, there is a kind of—there is a nice scientific word, I wish I could ask one of my colleagues for it—at any rate, this motor expression that is involved in burglary and things of that kind makes even property damage a more dangerous kind of possibility for the individual himself. You must remember it is more dangerous for him too than, let us say, another type of repititious forging." [35]

■ However, the uncontradicted testimony, both before the Circuit Court, and in this Court, establishes that in fact Patuxent recommends commitment as a defective delinquent only in cases where the inmate is considered to be dangerous to the person.[36]

This Court therefore finds as a fact that the "interpretation and application" of the Maryland Acts do not "include those whose conduct *indicates no more than* a danger to property * * *" (emphasis supplied).

■ V. "[W]hether Patuxent does in fact furnish treatment for treatable defective delinquents as distinguished from other lawbreakers which would support the Act under the equal protection clause of the fourteenth amendment"; VI, "whether the statute has not

33. Guttmacher, E. 175; Menninger, E. 324; Boslow, E. 665.

34. Menninger, E. 323–325. Lassen (Psychologist to the Circuit Court for Baltimore County), E. 542.

35. E. 323–324.
    To which this Court adds a personal "Amen." The recent trend to soften the obvious criminal act and attempting to salve conscience by calling it "civil disobedience", is significant.

36. E. 666, 784; Tr. 479.

become a mere device for warehousing the obnoxious and antisocial elements of society" and VII, whether "deficiencies in staff, facilities and finances" have undermined "the efficiency of the Institution and the justification of the law and * * * the constitutionality of its application." [37]

This Court holds that the findings [38] of the Circuit Court in these respects (Director v. Daniels, 1966, 243 Md. 16, 41–43, 49–50, 50–53, 58–62, 221 A.2d 397) are fully supported by the record before it, and are reinforced by the record before this Court.

Some supplementation, even if partially a duplication, may be helpful.

Referral to Patuxent for examination, findings and report does not automatically result in a staff finding of defective delinquency. Over twenty-five per cent of those examined are reported as not being defective delinquents.[39]

Those who are determined after court trial to be defective delinquents, and are committed to Patuxent as such, are not simply "warehoused." All committed inmates are "treatable", but not necessarily curable.[40]

"While we do not know ideally how to treat any psychiatric patients yet" [41], group therapy, available to all adjudi-cated defective delinquents, and participated in by most, is as effective as, or more so than, individual treatment;[42] and one of the least enthusiastic psychiatric witnesses stated that he would like to use it in his private practice, but that he could not get a group started.[43]

Patuxent's "follow-up"—that is, "keeping track of people within the institution and working with them after they leave", systematically—is better than that in most private hospitals.[44] In this connection, the halfway house, which was being sought by Patuxent when the Circuit Court hearings were being carried on [45], has become a successful fact.[46] Here, facilities exist for parole consultations and an outpatient clinic; and six completely furnished apartments are available for new parolees who have no established residence.

Since the Circuit Court hearing, the then existing shop has been added to and modified, and a complete house, with ducts, wiring and plumbing can be erected and dismantled.[47]

Speech therapy, at first a pilot project, has been established on a part-time basis, and when funds are available, will be put on a full-time basis.[48]

In addition to regular psychotherapy and other classes, Patuxent has established two [49] of four proposed treatment

---

37. This grouping would also incorporate the rather cryptic language in Question III as to whether "the proposed [sic] objectives of the Act are sufficiently implemented in its actual administration * * * "

38. The question raised by the Circuit Court as to whether the implementation of the Act in its actual administration is sufficient is a legislative rather than a judicial function is not a finding of fact. The actual findings as to adequacy of implementation and treatment—with which this Court agrees—moot the pertinence of the question.

39. E. 622.

40. E. 287, 643; Transcript 416, 462, 465. (At Tr. 422 Dr. Boslow explains an apparent contradiction, in Petitioners' Exhibit 1, December 1965, of this testimony).

The effort to handle people differently from conventional penal incarceration is certainly worthwhile, even if only partially successful, since "the penitentiary does not make you penitent, the reformatory does not make you reform, and the House of Correction does not correct." E. 732.

41. Dr. Jerome D. Frank, E. 387.

42. E. 385, 119, 221–224.

43. E. 119.

44. E. 407.

45. E. 636.

46. Tr. 200–203.

47. Tr. 203.

48. Tr. 207–208.

49. One in October 1967, one in April 1968, Tr. 218.

units, each of approximately ninety patients, to each of which are assigned two psychiatrists, two psychologists and two social workers. This professional staff of six is responsible for the psychotherapeutic needs of the patients in that unit, and also functions as the unit classification and discipline committee. In addition to increased contacts, the unit system is designed to bridge the gap otherwise occasioned by the departure of a psychiatrist to whom alone certain patients had been assigned.[50]

Appropriations for Patuxent have been increased yearly, and per capita for 1969, represent approximately five times the per capita appropriation per inmate of the House of Correction; four times that for the Penitentiary; and three times that for the Reformatory.[51]

Although Patuxent deals with the "least promising"[52] or "most difficult kind of patient"[53], Patuxent has a favorable parole record, particularly in view of its strict parole provisions, and extended parole time.[54]

Fortunately, help can be obtained by an inmate even if he does not want to be helped.[55] Some of the petitioners in the consolidated cases have progressed to the point of parole[56]; or to redetermination as no longer defective delinquents[57]; and two have been noticeably helped.[58]

### Miscellaneous.

Other points raised, but not as strenuously stressed, are:

a. The indeterminate sentence.

While from an administrative standpoint an argument can be made that extended terms for the protection of the public should be sentences to the prison system[59]; and while in the Circuit Court case there was some testimony as to the indeterminate sentence being a "minus factor"[60] the great weight of professional testimony placed it as a "plus" factor; it is "an incentive because it does place in large neon bright letters the fact that you have got to work on this thing or you are going to be here

---

50. Tr. 209–219.

51. Tr. 337–339.

52. E. 215.

53. E. 388.

54. E. 215; Tr. 340–347.

55. E. 228; Tr. 412.

56. Creswell—Tr. 15–24; 419.

57. Sas; see 243 Md., p. 26, footnote 2, and p. 62, footnote 13, 221 A.2d 397; Monroe. The Morning Sun, November 27, 1968, p. A 7.

58. Tippett was given two work-out opportunities, but ran away (literally, and figuratively), and then voluntarily returned, to avoid making decisions (Tr. 54–56, 65). In the Circuit Court he admitted to speech improvement (of an apparently congenital defect), which he attributed to group therapy, not speech therapy (E. 590). Before this Court he spoke clearly and without difficulty. He then referred to attending classes in speech therapy for four years, sometimes in a group of four, sometimes individually. (61–64).
Shine testified in this Court that beginning about a year ago he had begun keeping out of trouble and had progressed

to the third tier; but that this was looking for a way to get out of Patuxent, and that he was simply "conning" the authorities (Tr. 153–154). He also expressed fear that he would not progress rapidly to the fourth tier because of his testimony in this Court. (Tr. 158). On December 30, 1968 he wrote this court, saying in part:
"* * * At this hearing my testimony for the most part was true, however I lied on one question when I was asked how I got to the third level. My answer was that I shamed [sic; probably "shammed", was meant; the equivalent of "conned"] my way their [sic]. This is not true and I made this known to the authorities here at the institution. Since the hearing I have progressed to the 4th level and in January 1969 I will go before the board of review. The institution may at that time feel that I have progressed enough to be released on some type of status * * *"

59. Guttmacher, E. 226–227; Report of Commission to Study Changes and Basis of Selection for Patuxent Institution to Governor J. Millard Tawes, December 9, 1965, Petitioners' Exhibit 1, p. 25 et seq.

60. Schnoor, E. 155; see also E. 141.

for a very long period of time" [61]; "In Patuxent it becomes very clear to the patients that they have to really convince the staff that they have changed, it is not enough to behave oneself. This is a powerful means of enlisting them in the process" [62]; it gives "the keys to the prison cell to the inmate himself" * * "the incentive for the offender in his attempts to cooperate with the correctional program are greatly enhanced by this indeterminate sentence" and under it "the treatment personnel determines when the treatment should be terminated" [63]; it has therapeutic value in and of itself, "they have the responsibility for their acts themselves" [64]; it is a definite reward and punishment system. "It is like training a child all over again." [65]

■ Incentives for cooperation are proper (Abernathy v. Cunningham, 4 Cir. 1968, 393 F.2d 775, 777–778). Certainly the record contains ample justification for the use of the indeterminate sentence.

### b. Nonsegregation of sex deviates.

■ Some complaints were voiced by the inmates at the failure to segregate inmates who are homosexuals or sex deviates from the rest of the population. The reason for this was clearly stated at the hearing in this Court:

"Our primary goal is to rehabilitate each of our patients so that they can return back to a basically non-segregated society, a society in which homosexual people with different sorts of personalities have to learn to exist together in harmony.

"Our primary goal with each one of our committed patients is to return him back to the society as it exists. On that basis, we feel that it is not ap-

propriate to isolate retarded from non-retarded, sex deviates from non-sex deviates, people with a history of burglary from people who have a history of armed robbery, et cetera.

"We feel that they should be mingled and learn how to live together and control themselves in living together, since this is what is required for societal living." [66]

This explanation seems to this Court to be entirely reasonable and proper.

### c. No women at Patuxent.

■ It is not necessary to consider whether or not the petitioners, all male, have standing to question the legality of the fact that no female defective delinquents have been committed to Patuxent. Insofar as their interest is ulterior, it is quite clear that women would not, if committed under the Maryland Act, be inmates in Patuxent, which could not satisfactorily be run as a co-educational institute. According to the only testimony on the subject, the number of female defective delinquents "fortunately" is small, and would not justify building a separate institution for them.[67]

The point has been considered by the Maryland Court of Appeals in Chambers v. Director, 1966, 244 Md. 697, 223 A.2d 774 and in Gray v. Director, 1966, 245 Md. 80, 85, 224 A.2d 879. This Court [68] considers the question to be completely, and satisfactorily, answered in Chambers, where the Maryland Court of Appeals said (244 Md. at 699–700, 223 A.2d at 776):

" * * * There is nothing in Article 31B which suggests that the term 'an individual,' as used in § 5 excludes women. * * * [T]he courts [may just] have not seen fit to refer any women for examination or treatment.

61. Guttmacher, E. 226, 227.

62. Frank, E. 384.

63. Lejins, E. 454, 455.

64. Dr. Anna Maria Rosenbert, Utrecht, Holland, E. 672.

65. Boslow, E. 731.

66. Tr. 241.

67. Guttmacher, E. 249–250.

68. And Judge Kaufman in Alston v. State of Maryland et al., in the United States District Court for the District of Maryland, Civil No. 19456.

"Should it become necessary or desirable to examine women for possible defective delinquency and thereafter to confine for treatment those found to be defective delinquents we believe it is reasonable to expect that the State will provide the necessary facilities, whether temporary or permanent. Moreover, assuming the State has chosen (administratively, judicially or both) to exclude them, it can not be said that this would constitute an improper exercise of power. We see no reason why the State can not limit the program to whichever sex seems immediately to constitute the greater danger to society, provided the basis for this determination is a reasonable one. * * *"

d. Testimony by treating psychiatrist.

Question has also been raised as to the desirability of a treating psychiatrist testifying at a determination or redetermination hearing. Expert opinion varied from "bad" as destroying a relationship of trust and confidence[69], to not "ideal"[70] to "good;" this last, on the basis that it brings the patient face to face with reality, and away from wishful thinking.[71]

Certainly this Court could not say, in view of this conflict, that it was illegal[72] or improper for the treating psychiatrist to testify in court. This practice, however, which even at the time of the trial in the Circuit Court was infrequent[73], had been practically eliminated by the time of the hearing in this Court.[74]

e. Denial of treatment by private psychiatrist.

At the hearing in the Circuit Court, one of the witnesses testified that he was able to pay for, and desired, the services of a private psychiatrist while in Patuxent, but that this was denied him. The reason for this refusal was adequately, and satisfactorily, explained in a letter from Dr. Boslow to the referring Judge:[75]

"Thank you for your letter of September 24, 1964, inquiring whether the policies of this Institution permit the treatment of inmates on a private basis by psychiatrists not connected with the Institution.

"I have given the question careful consideration, and although I am, myself, of the view that this ought not to be permitted, I submitted the question to our Board at a recent meeting. They were also of the view that this could not be permitted.

"As you know, this Institution serves two purposes, the detention of those who are adjudicated to be defective delinquents for the protection of society, and the treatment of inmates in the effort to render them fit to be released. To an important extent the treatment program and the disciplinary programs are combined, with the results that the inmates cooperate in a treatment program and his successful response to its results in his graduation to increasing liberties within the Institution and ultimately in some cases to recommendation for parole and release.

"Under such a program it is necessary that the Institution must have full responsibility for and full control over the treatment program. The in-

69. Meng, E. 87; Schnoor, E. 136–138; Rosenberg, E. 674.

70. Menninger, E. 294.

71. Guttmacher, E. 240; Boslow, E. 739. Dr. Boslow's illustration is striking: " 'You know, for the first time in my life I actually saw myself, because you told me I was this kind of a guy, you told me I was a bum,' to quote one patient, 'and all of a sudden I realized I was.' "

72. The treating psychiatrist might well be able to give more intimate details on cross-examination; and would reduce the area of hearsay.

73. E. 739.

74. Tr. 422–423.

75. E. 556–557. The complainant did have the services of a private psychiatrist at the determination hearing in court. E. 558–559.

dividual inmate has been subjected to this regime by law and his period of confinement may be determined by his response to the treatment given.

"In those circumstances, we do not believe that we can properly share with private persons the Institution's official responsibility for the treatment program.

"I regret to have to give you this negative response, and trust that you will accept my assurance that your suggestion has been given respectful consideration."

f. Section 16(d) of the Act.

Section 16(d) of the Maryland Act reads as follows:

"(d) *Transfer from Institution for employment, treatment or imprisonment.*—Any person in the custody of Patuxent Institution may be transferred, by agreement between the Institution and the Department of Correction, to the custody of the Department of Correction for employment on a prison farm or in any work project or for hospitalization or for other treatment for illness or for imprisonment; provided, however, that except in cases of transfer for hospitalization or treatment for illness it shall first be found by the institutional board of review that such transfer will not reduce or retard the prospect of such person's release from confinement as a defective delinquent, and provided further that such person, notwithstanding transfer, shall remain committed to Patuxent Institution and shall be returned, there at least an-

nually for reexamination by the institutional board of review."

No one has been transferred under this provision since Patuxent opened in 1955 [76], so that there has been no practical construction of it.

■ Initially it might be feared that the transfer "for imprisonment", since the transferred person is still committed to Patuxent, would permit life imprisonment in an ordinary penal institution of an untreatable, or a simply obnoxious person. Since the testimony is to the effect that there are no untreatables at Patuxent, the first ground is presently inapplicable. As to the second, the transfer, except where for hospitalization or treatment for illness, can be made only after a finding by the institutional board of review "that such transfer will not reduce or retard the prospect of such person's release from confinement as a defective delinquent." Therefore, since the transfer of a "treatable" for imprisonment only would impair the prospect of his release as a defective delinquent the required finding precedent to transfer could not be made.[77] Since section 16(d) is susceptible of a constitutional interpretation this Court is not at liberty to, and does not, assume that a contrary use of it will be attempted.[78]

### Conclusion.

■ This Court finds as a fact, and concludes as a matter of law, that the Maryland Act is not only constitutional on its face, but also in its interpretation, application, administration [79] and results.

The consolidated petitions are, and each is, hereby dismissed.

---

76. Tr. 449.

77. Temporary imprisonment might be consistent with therapeutic treatment. One occasionally but not regularly violent might be restrained until ready to resume treatment at Patuxent or the transfer might, or might reasonably be expected to be, in the nature of a "shock" treatment, making the person more receptive to the therapy at Patuxent.

78. Contest as to the propriety of a transfer could perhaps be made by habeas corpus or other proceedings.

At the worst, section 16(d), if in construction or application were to become unconstitutional, would clearly be severable.

79. This Court was most favorably impressed by the Director and his staff who testified. They impressed this Court as being capable, and humane, truly interested in the inmates as individuals, and sincerely endeavoring, under extremely trying circumstances, to help them to improve themselves, and hopefully, to be released.